JOSEPH P. RUSSONIELLO
United States Attorney
BRIAN STRETCH
Chief, Criminal Division
THOMAS M. NEWMAN (CTSBN 422187)
Assistant United States Attorney
 9th Floor Federal Building
 450 Golden Gate Avenue, Box 36055
 San Francisco, California 94102
 Telephone:    (415) 436-6805
 Fax:             (415) 436-6748

Attorneys for the United States of America

## IN THE UNITED STATES DISTRICT COURT FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | **No.  CR-07-0298-CRB** |
| **Plaintiff,** | **UNITED STATES'** |
| **v.** | **TRIAL BRIEF** |
| **FAWZI MAHMOUD SWALIM,** | **DATE: May 12, 2008** |
| **Defendant.** | **TIME:  9:00 A.M.** |

The United States submits this pretrial conference statement pursuant to Local Rule 17-1.

## I. INTRODUCTION

Defendant Fawzi M. Swalim is charged with three counts of making and subscribing false federal tax returns for the 2000, 2001, and 2002 tax years in violation of 26 U.S.C. § 7206(1).  The trial is scheduled to commence on May 12, 2008.  The government's case-in-chief is estimated to last three-four days.

## II. STATEMENT OF FACTS

Fawzi Swalim admitted in July 2004 to an IRS agent that he was carrying out a scheme to under-report his taxable income.  During these recorded meetings, Swalim explained that he maintains purchase invoices for the inventory sold at the New Santa Clara Market ("NSCM"), and Divisadero Farmer's Market ("DFM"), which he then provides to his bookkeeper.  Swalim's bookkeeper/accountant, Basheer K. Abdullah, computes the stores' gross income by applying a 35% markup to the cost of the inventory.  Because his bookkeeper calculates Swalim's gross

1  income based on this formula.  Consequently, any invoices withheld from the bookkeeper results
2  in a reduction of both cost of goods sold and gross income.

3      The evidence will show that Swalim admitted that he concealed invoices — exploiting
4  this formula used to compute his income — for the express purpose of understating his tax
5  liability.  Swalim explained that he provides his bookkeeper monthly sales figures for each store
6  along with expense invoices related to monthly purchases.  Based on the records Swalim
7  provided, the stores' bookkeeper calculated that NSCM's gross sales were $23,000 to $35,000
8  per month during 2000 through 2002, and DFM's gross monthly sales were $33,000 to $45,000
9  for the same period.  Swalim told an IRS agent that these figures grossly understate each stores'
10  annual income.

11      On July 8 and 16, 2004,[1] Swalim revealed his method of understating income to person
12  he believed was interested in purchasing the store(s), who was an IRS agent.  In contrast to the
13  figures provided to the bookkeeper, Swalim stated that DFM's gross sales were actually $70,000
14  per month, he was "netting $18,000 per month," and that DSM made $1 million gross sales per
15  year – rather then the $400,000 reported.  Swalim showed the agent where he hid invoices to
16  avoid paying "too much tax."  He explained that the stores' income could calculated correctly by
17  totaling the invoices he gave to the bookkeeper, and then adding back those hidden invoices.
18  Swalim also showed the a set of books for DSM confirming the stores' actual income, and
19  referring to the book, he stated: "I swear to God, I swear to God, I swear to God, this is the truth.
20  I am not trying to lie to you."  Swalim's books contain over 1,940 daily sales entries, from 1999
21  through 2004, stating monthly sales that were twice his reported gross income.

22      Swalim further stated that he only hides where he made cash payments.  He explained to
23  the agent that it he cannot hide invoices paid by check, which show up in his bank records.
24  Swalim also offered to assist the IRS agent in implementing the same method to understate his
25  income if he bought the store.

26      On August 6, 2004, IRS special agents interviewed Swalim and seized the purchase

27
28      [1]Both the July 8 and 16, 2004 meeting were recorded.

U.S.' Trial Brief
Case No. 07-298-CRB          -2-

invoices he hid.  Consistent with his July 2004 statements, the IRS agents seized the invoices

from a location Swalim divulged to the undercover agent, and nearly all of the 1,422 hidden

invoices were paid in cash.  The information related to these invoices is summarized as follows:

| Year | Number of Invoices | Store | Cost of Invoices | Number Paid in Cash |
|------|--------------------|-------|------------------|---------------------|
| 2000 | 393 | NSCM | $ 95,174 | 386 |
| 2000 | 394 | DFM | $211,394 | 376 |
| 2000 | 136 | Unmarked | $ 13,663 | 119 |
| **Total:** | **923** | | **$320,231** | **881** |
| 2001 | 500 | NSCM | $148,585 | 487 |
| 2001 | 558 | DFM | $247,964 | 507 |
| 2001 | 187 | Unmarked | $ 21,056 | 182 |
| **Total:** | **1245** | | **$417,605** | **1176** |
| 2002 | 594 | NSCM | $131,434 | 582 |
| 2002 | 636 | DFM | $232,336 | 562 |
| 2002 | 192 | Unmarked | $ 14,944 | 191 |
| **Total:** | **1422** | | **$378,714** | **1335** |

In August 2004, Swalim also told IRS agent that he no sources of income other than from

the two stores his rental property.  Specifically, Swalim stated he had no cash savings at his

home or in the bank, no stock or brokerage accounts, and that he received no gifts or inheritances

from anyone.  He also denied borrowing (or lending) money from his relatives or acquaintances

during this period.  Put simply, Swalim has maintained he has no cash savings.

Swalim confirmed that his net profit was based on a 35%  markup of the total inventory

expenses.  Aside from the markup percentage, Swalim and his bookkeeper provided different

explanations for how the stores compute income.  In July 2004, Swalim insisted that at the end of

the day he prints a daily summary of the stores' sales, commonly referred to as 'Z-Tapes,'[2] and

---

[2]On August 4, 2004, the IRS seized over two months of daily summaries (Z-Tapes) for
that year.  These summaries detail roughly 1,800 transactions that were completed at DFM per
day.  Some Z-Tapes were contained in Swalim's hidden books.  In addition, the summaries on
the Z-Tapes – which are comprised of thousands of transactions – were all accurately transcribed
into the hidden books.  The daily Z-Tapes also show a running tally of the yearly sales.  The July
18, 2004 daily summary states that DFM's gross sales for equaled $841,518 – significantly more
than Swalim's reported gross sales, but consistent with the number in his hidden books.

1   provides the monthly total to his bookkeeper.  Swalim recanted after he was shown a copy of the

2   hidden journal he kept that recorded DFM's "correct" income.  Swalim then claimed that the

3   journal listed "inflated" sales figures for the purpose of misleading any would-be purchasers.  At

4   that point, he claimed that he simply memorized the daily sales figures.

5           Swalim's bookkeeper explained that he calculates the stores' income by applying a 35%

6   markup to the purchased inventory after subtracting inventory expenses paid in cash or

7   otherwise.  The bookkeeper does this on a monthly basis using statements Swalim gives him,

8   including expenses paid inc cash.  Swalim provide the following information regarding expenses

9   paid in cash to the bookkeeper:

10  | Year | NSCM | DFM | **Total** |
    |------|------|-----|-----------|
11  | 2000 | $100,083 | $123,124 | **$223,208** |
    | 2001 | $116,685 | $137,644 | **$254,329** |
12  | 2002 | $108,223 | $153,121 | **$261,344** |

13  The bookkeeper kept the invoices which were reported on Swalim's returns, as an expense that is

14  marked up to compute his income.  The IRS agents confirmed that the bookkeeper never saw the

15  hidden invoices.[3]  On his tax returns filed for 2000 through 2002, Swalim reported the following

16  related to NSCM:

17  | Year | Gross Receipts | Net Income from NSCM | Adjusted Gross Income |
    |------|----------------|----------------------|-----------------------|
18  | 2000 | $346,641 | $23,199 | $11,753 |
    | 2001 | $372,612 | $15,016 | $11,388 |
19  | 2002 | $329,979 | $10,819 | - (2,213) |

20          Although Swalim manages, operates, and is the sole employee at DSM the income from

21  that business is reported on his ex-wife's tax return, Badea I. Mousa.  Swalim's bookkeeper has

22  confirmed he never deals with Mousa, and receives information related to DSM from Swalim.

23  Swalim has confirmed that Mousa,[4] who does not speak English, does not work in the store and

24

25  _____

26  [3]This explains why the expenses paid cash reported to the bookkeeper for both stores is
    significantly less than the totals for the cash amounts paid for the hidden invoices.

27  [4]In fact, the IRS investigation found that DSM's earnings are deposited in the company's

28  business account.  In addition, the expenses are paid by check or direct withdrawal from that

he makes all decisions at DSM.  For 2000-2002, Mousa's federal income tax returns reports the following:

| Year | Gross Receipts[5] | Net Income from DFM | Adjusted Gross Income |
|------|-------------------|---------------------|-----------------------|
| 2000 | $450,529 | $19,387 | $14,309 |
| 2001 | $472,484 | $21,650 | $15,553 |
| 2002 | $479,718 | $19,860 | $12,745 |

But during an interview, Mousa stated that she is not paid the amounts reported on her tax returns.  Rather, she insists that Swalim pays her personal expenses which total $5,000 every month.  That amount includes, *inter alia*, support for their children, spending money, her mortgage payments, and property taxes.  Swalim writes Mousa a $2,000 check each month, and pays the mortgage and property taxes for her home directly.  Mousa does not have access to DFM's accounts.

Aside from the payments to Mousa, Swalim has made other substantial expenditures on a monthly basis from 2000-2002.  For example, in February 1998, Swalim purchased two $1,000,000 life insurance policies: one for him and the other for his wife.  From inception, Swalim has paid $1,501.67 per month for his wife's policy, and $1,713.57 per month for his policy through February 2003.[6]  In addition, Swalim is order to pay monthly child support in the amount of $443 per month.  Swalim's monthly personal expenses for 2000 can be summarized as follows:

| Amount | Payee | Purpose of Payment |
|--------|-------|--------------------|
| $2,000 | Mousa | Support & Personal Expenses |
| $1,603 | Wells Fargo | Mousa's Mortgage Payments |
| $1,501 | John Hancock | Swalim's Wife's Life Insurance |
| $1,713 | John Hancock | Swalim's Life Insurance |
| $  443 | Cal. Sup. Court | Child Support |
| **Total:** | **$7,260** | |

account.  Swalim has *sole* signatory authority over each of those accounts, which he opened.

[5]The hidden journal stated that DSM's gross receipts were in fact $1,005,337, $1,013,947, $921,042 for 2000, 2001, and 2002, respectively.

[6]These payments total $91,601.87 for his wife's policy and $87,392.07 for his policy from 1998 through 2002.  Swalim's payments ended in April 2002.

U.S.' Trial Brief
Case No. 07-298-CRB                    -5-

1   Based on only this monthly figure, and ignoring all other expenses, Swalim paid at least $87,120

2   for personal in 2000.  All of these monthly obligations continued in 2001 and 2002.  In fact,

3   Mousa's mortgage payments increased to $1,734 in 2001, and $1,864 per month in 2002.

4   Swalim's statement that he has no savings, combine with his reported taxable income cannot be

5   reconciled with these expenses.  His reported income, even after adding Mousa's, is not even

6   enough to pay her mortgage.

7       Aside from those monthly payments, Swalim also paid the following expenses:

8

| Year | Amount | Payee | Purpose of Payment |
|------|--------|-------|--------------------|
| 2000 | $ 8,036 | First Horizon | Swalim's Mortgage |
| 2000 | $ 7,716 | San Francisco | Real Estate Taxes |
| 2001 | $ 6,719 | First Horizon | Swalim's Mortgage |
| 2001 | $10,165 | San Francisco | Real Estate Taxes |
| 2002 | $ 4,923 | First Horizon | Swalim's Mortgage |
| 2002 | $10,288 | San Francisco | Real Estate Taxes |
| **Total:** | **$47,847**[7] | | |

14      From 2001 through 2002, Swalim also purchased six cars.  He bought a Lexus,

15  Mercedes,[8] two BMWs, Honda, and an Acura for a total of $95,959.  Swalim financed the Lexus

16  after putting down $5,000, and obtaining a $29,460 loan.[9]  On that loan application, Swalim

17  listed his monthly income as $20,000 – his reported income for 2000-2002 *combined*.  Similarly,

18  Swalim stated on the loan application financing the BMW that his monthly income equaled

19  $10,000 in 2002.[10]  Swalim told IRS agent that he gave the three vehicles he financed – the

---

[7]Swalim does claim a mortgage interest expense for only 2001-2002.  For 2000, although he can deduct the mortgage expense, but he did not.  Notably, these two amounts, $8,036 for his mortgage and $7,716 for property taxes, alone exceeds his income of $11,753 for 2000.

[8]Swalim purchased the 1997 Mercedes for $22,737, which he gave to one of his children.

[9]As part of that agreement, Swalim was obligated to pay $688 per month for 60 months.

[10]Swalim subsequently gave the BMW to his son and is required to make $300 payments for the finance of this vehicle.  Moreover, Swalim applied for a loan to finance $24,399 of the $32,017 purchase price of the Acura.  As part of that loan application dated September 10, 2002, he stated his monthly income of  $10,000.  Swalim is paying $533 per month, for 59 months, to finance this vehicle which he gave to his son.

1    Acura, Mercedes, and BMW– to his children.  He also confirmed that he is paying the loans.

2    　　　Consistent with the statements on the three auto-loan applications, Swalim has routinely

3    claimed monthly income of $10,000 to other creditors.  Starting on January 22, 1997, Swalim

4    signed a mortgage loan application claiming monthly income of $9,000-10,000 from his store.[11]

5    A year later, on October 7, 1998, Swalim applied for a loan to purchase DSM that is secured by

6    Mousa's residence.  Swalim stated his stated his monthly income was $9,000-10,000, and that he

7    had $90,000 in savings.[12]  In April 1999, Swalim spent over $160,000 to purchase DSM, which

8    was partially financed.  His bank records confirm his earlier statements that, starting in 1999 he

9    exhausted his savings and he received income from the stores.

10    　　　In sum, Swalim stated that he earned between $10,000-20,000 per month on at least five

11    loan applications from 1997 through 2002.  Beyond making these statement, he paid the loans.

12    This includes his mortgage, Mousa's mortgage, and the three auto-loans for cars he gave to his

13    kids.  The evidence demonstrates Swalim made more $11,753, in any one year, which translates

14    into $980 per month.  He reports no positive income in 2002.

15    　　　　　　III.  <u>APPLICABLE STATUTES AND THEIR CONSTRUCTION</u>

16    A.    Making And Subscribing False Federal Income Tax Returns

17    　　　Title 26, United States Code, section 7206(1), provides in pertinent part:

18    　　　　　Any person who willfully makes and subscribes any return, statement, or
     other document, which contains or is verified by a written declaration that
19    　　　　　it is made under the penalties of perjury, and which he does not believe to
     be true and correct as to every material matter . . . shall be guilty of a
20    　　　　　felony and, upon conviction thereof, shall be fined not more than
     $100,000.00 . . . or imprisoned not more than 3 years, or both, together
21    　　　　　with the costs of prosecution.  Id.

22    　　　To establish a violation of Section 7206(1), the government must prove the following

23    three elements beyond a reasonable doubt: (1) the defendant made and signed an income a tax

24    return for the calendar year that he knew contained false information as to a material matter;  (2)

25

26    　　　　[11]On the same application, Swalim states that his only assets are $122,500 savings, which

27    is depleted in 1998 when he purchased DSM.

28    　　　　[12]Among his liabilities, Swalim lists Mousa's mortgage payments.

1   the return contained a written declaration that it was being signed subject to the penalties of

2   perjury; and (3) in filing the false return, the defendant acted willfully.  United States v. Bishop,

3   412 U.S. 346, 350 (1973); United States v. Marabelles, 724 F.2d, 1374, 1380 (9th Cir. 1984).

4           1.      Made And Subscribed Income Tax Returns

5           Section 7206(1) expressly applies to "any return, statement, or other document" signed

6   under penalties of perjury.  To meet its burden that the defendant made and subscribed a return,

7   the United States must prove that the return was filed with the IRS.  United States v. Hanson, 2

8   F.3d 942, 945 (9th Cir. 1993).

9           2.      The Returns Are False As To A Material Matter

10          In order to sustain a conviction under Section 7206(1), the government must establish

11  that the relevant documents were false as to a material matter.  Materiality may be established

12  under one of two tests.  First, any item required on an income tax return that is necessary for a

13  correct computation of the tax is a material matter.  United States v. Strand, 617 F.2d 571, 574

14  (10th Cir. 1980); United States v. Null, 415 F.2d 1178, 1181 (4th Cir. 1969); Siravo v. United

15  States, 377 F.2d 469, 472 (1st Cir. 1967).  Second, a false item is material if it has a natural

16  tendency to influence or impede the IRS in ascertaining the correctness of the tax declared or in

17  verifying or auditing the returns of the taxpayer. See United States v. Fawaz, 881 F.2d 259, 264

18  (6th Cir. 1989); United States v. Greenberg, 735 F.2d 29, 31 (2d Cir. 1984).  Under either test,

19  understating gross receipts impedes the IRS from determining the correct tax.  That is

20  particularly true where, as here, a taxpayer's net income is a function of their expenses.  In that

21  regard, false statements and/or omissions concerning income have been found to be material

22  matters in violation of Section 7206(1), regardless of the amount of the discrepancy.

23          In this case, the evidence establishes that the returns filed by Swalim were false as to a

24  material matter in at least two ways.  First, Swalim understated his expenses.  Even if Swalim

25  owed nothing, his returns are still false because he hid invoices from his accountant.  Second,

26  because Swalim's accountant computes net income based on his expenses, his concealing those

27  invoices necessarily understates income as well.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3.     The Documents Contained A Written Declaration That
They Were Made Under Penalties Of Perjury

On the 2000, 2001, and 2002 individual income tax returns, Swalim's signature appears directly below jurats stating that the return is signed under penalties of perjury.  Moreover, Swalim confirmed that he signed each of these returns during interviews with investigators.

4.     Swalim Did Not Believe That The Returns Were True
As To A Material Matter And Acted Willfully

Willfulness in the context of tax crimes is defined as "voluntary, intentional violation of a known legal duty."  United States v. Bishop, 412 U.S. 346, 360-61 (1973); see also Cheek v. United States, 498 U.S. 192 (1991); United States v. Pomponio, 429 U.S. 10, 12 (1976).  As the definition implies, willfulness requires more than a showing of careless disregard for the truth. Pomponio, 429 U.S. at 12.  To establish this element, the government must show that a taxpayer was aware of his or her obligation under the tax laws, United States v. Conforte, 624 F.2d 869, 875 (9th Cir. 1978), and intended the return to be false when he subscribed to it.  United States v. Engle, 458 F.2d 1017, 1019-20 (8th Cir. 1972).  Knowledge of the falsity of a return's contents can be established by a defendant's signature on the return once the return has been shown to be false.  United States v. Drape, 668 F.2d 22, 26 (1st Cir. 1974); United States v. Romanow, 509 F.2d 26 (1st Cir. 1975). Willfulness is typically established by circumstantial evidence.  United States v. Marabelles, 724 F.2d 1374, 1379 (9th Cir. 1984); United States v. Clairborne, 765 F.2d 784, 798 (9th Cir. 1985).

Swalim's willfulness can be established in several ways.  First, Swalim divulged his scheme to hide invoices from his bookkeeper and understate his income in a recorded conversation.  Swalim also kept a concealed set of books he stated was accurate, and made his "hidden" purchases in cash.  Swalim's actions are all evidence of willfulness.  Spies v. United States, 317 U.S. 492, 499 (1943) (keeping separate sets of books and acts of concealment are evidence of willfulness); United States v. Samara, 643 F.2d 701 (10th Cir. 1981) (concealment of cash receipts is further evidence of willfulness.)

Swalim also misled IRS agents.  In August 2004, Swalim told IRS agents that he calculates his daily sales based on summaries printed from DFM's only cash register.  After IRS

U.S.' Trial Brief
Case No. 07-298-CRB                    -9-

1  agents confronted Swalim with books he was concealing, which matched the summaries, he

2  claimed that he memorized the sales figures.  Swalim's false statements to IRS employees are

3  indicative of willfulness. United States v. Chesson, 933 F.2d 298, 304 (5th Cir. 1991).

4     Second, Swalim's willfulness can be established indirectly based on the amount of his

5  personal expenditures.  Swalim told IRS agent that he had no savings, personal loans, or other

6  sources of income from 2000-2004.  Swalim's combined income for all three years totaled

7  $20,968.  But Swalim paid over $7,260 each month for his ex-wife's mortgage, life insurance

8  policies, and child support payments.  He also paid five times his total three-year income,

9  $95,959, for six luxury cars.  He gave three of those cars to his children.

10    Third, Swalim has consistently stated on loan applications that he made $10,000-20,000

11 per month.  This is also more than ten times the income he reported on his tax returns for any one

12 year.  Even if Swalim claimed he falsified the loan applications, he was able to make the

13 payments.  Among these payments, and ignoring the cash he put down, he paid $300, $533, and

14 $688 for the BMW, Acura, and Lexus he gave to his children.  Lastly, willfulness can be also

15 shown through business acumen and education.  United States v. Segal, 867 F.2d 1173, 1179

16 (8th Cir. 1989); United States v. Payne, 800 F.2d 227, 229 (10th Cir. 1986) (income over

17 $100,000 is sufficient to infer knowledge and willfulness).

18    Swalim violated section 7206(1) if, knowing his duty to file true and correct tax returns

19 when due, he voluntarily and intentionally failed to do so.  Cheek v. United States, 498 U.S. 192,

20 201-04 (1991).  The purpose of the willfulness element in tax offenses is to protect people who

21 have misconstrued their duty under the tax code because of its complicated nature.  Id. at 205.

22 The evidence demonstrates that Swalim did not misunderstand the law when he violated it.

23                    IV.  EVIDENTIARY MATTERS

24    The parties have discussed stipulations concerning facts and exhibits and hope to reach

25 and file those stipulations prior to the May 6, 2008 pretrial conference.

26    1.    Summary Exhibits

27    At trial, the United States intends to introduce several summary exhibits into evidence

28

1  pursuant to Fed. R. Evid. 1006.[13]  Rule 1006 of the Federal Rules of Evidence permits party to

2  introduce summary exhibits at trial provided that the proponent of these materials establishes the

3  admissibility of the underlying documents.  United States v. Johnson, 594 F.2d 1253, 1256-57

4  (9th Cir. 1979).  While the admissibility of the underlying documents is a precondition to

5  admitting the summary evidence, those documents are not themselves required to be admitted as

6  evidence.  Johnson, 594 F.2d 1253, 1257 fn. 5; United States v. Shirley, 884 F.2d 1130, 1133

7  (9th Cir. 1989); United States v. Meyers, 847 F.2d 1408, 1411 (9th Cir.1988); United States v.

8  Johnson, 594 F.2d 1253, 1254-57 (9th Cir. 1979).

9  The United States intends to introduce summary exhibits regarding two categories of

10 documents.  The government has prepared a summary chart detailing the amount, vendor, and

11 manner of payment for the invoices Swalim concealed from his accountant.  The second deals

12 with the numerous personal expenses Swalim paid from 2000 through 2002.  This evidence

13 summarizes voluminous bank records, and checks that Swalim wrote for these expenditures.

14 These are addressed in turn.

15 First, the IRS seized third-party invoices that SWalim said he was hiding.  These

16 documents are admissible as business records under Fed. R. Evid. 803(6), which permits records

17 generated in the regular course of an ongoing business to be exempted from the hearsay

18 exclusionary rule.  The proponent of the records at issue must show that the records were "made

19 at or near the time by, or from information transmitted by, a person with knowledge, [that they

20 were] kept in the course of a regularly conducted business activity, and [that] it was the regular

21 practice of that business activity to make the memorandum, report, record, or data compilation."

22 Fed. R. Evid. 803(6). The United States is prepared to make this showing regarding the seized

23 records by various means, including the testimony of seizing agents.

24 Proof that proffered records qualify as business records under Rule 803(6) may be

25 introduced through "the testimony of the custodian *or other qualified witness*," who can explain

[13]These documents are unquestionably voluminous.  As noted above, Swalim hid 1,446 invoices and admitted paying for them in cash.  Moreover, the United States has provided defendant the opportunity to inspect and copy these records.

U.S.' Trial Brief
Case No. 07-298-CRB        -11-

1   the record keeping of the organization.  Fed. R. Evid. 803(6) (emphasis added).  "It is not

2   necessary that the person who actually prepared the business record testify, nor that the

3   document be prepared by the business which has custody of it, so long as other circumstantial

4   evidence suggests the trustworthiness of the record."  United States v. Hawkins, 905 F.2d 1489,

5   1494 (11th Cir. 1990) (citing United States v. Parker, 749 F.2d 628, 633 (11th Cir. 1984));

6   accord United States v. Metallo, 908 F.2d 795, 799 (11th Cir. 1990.)

7          Thus, the foundation for the application of Rule 803(6) may be laid, in whole or in part,

8   "by the testimony of a government agent or other person outside the organization whose records

9   are sought to be admitted."  United States v. Hathaway, 798 F.2d 902, 906 (6th Cir. 1986). The

10  only requirement is that the "witness be familiar with the record keeping system."  Id.  In

11  Hathaway, the Court of Appeals upheld the admission of records including transaction

12  statements, advertising material, copies of  checks, correspondence and client files seized from

13  the offices of a fraud perpetrator.  The government established the foundation for the business

14  record exception in part by the testimony of a special agent involved with the case.  Id. at 906.

15         Moreover, documents received from third parties that are incorporated into the business

16  records of the recipient also satisfy the business records exception if they were relied upon by the

17  recipient for their accuracy.  United States v. Childs, 5 F.3d 1328, 1334 (9th Cir. 1993)

18  Air Land Forwarders, Inc. v. United States, 172 F.3d 1338, 1342 (Fed. Cir. 1999); see also

19  United States v. Ullrich, 580 F.2d 765, 772 (5th Cir. 1978) (automobile manufacturer's

20  documents kept and relied upon by dealership obviously admissible under Rule 803(b));  United

21  States v. Parker, 749 F.2d 628, (government export documents kept by importer).  Here, the

22  seized third-part invoices were kept in the regular course of defendant's business.

23         Second, the summary of Swalim's personal expenses is derived almost exclusively from

24  his bank records.[14]  These include checks Swalim drafted to his ex-wife, payments made directly

25  from his bank account, and loan applications he signed.  In each case, the record custodian

26

27         [14]It should be noted that on April 10, 2008, defense counsel agreed to stipulate as to the
28  admissibility of Swalim's bank records.

U.S.' Trial Brief
Case No. 07-298-CRB              -12-

1    provided a written declaration attesting to the authenticity of these documents, which satisfies

2    the requirements of Fed. R. Evid. 902(11). Thus, the underlying documents for these expenses

3    are also admissible.

4            2.    <u>Consensually Monitored Recording of Defendant</u>

5            The United States will also introduce the audio recording of defendant's conversation

6    outlining his method to intentionally understate his income. This recording is admissible under

7    Fed. R. Evid. 801(2) and 901(6). Both the IRS agent who met with Swalim, and the individual

8    who prepared the recording, will be available to testify regarding their use if the equipment and

9    identify the defendant's voice.

10           3.    <u>Notice of Intent to Offer Evidence Under F.R.E. 404(b)</u>

11           The United States intends to offer evidence which defendant might argue falls under

12   Rule 404(b). Such evidence includes Swalim's concealed set of books, summary register

13   receipts (Z-Tapes) for 2004, and defendant's history of claiming that his income was between

14   $10,000-20,000 per month to creditors.

15           To the extent any of these matters fall outside of the charges in the Indictment, they are

16   nonetheless admissible because they are "inextricably intertwined" with the charged crimes and,

17   therefore, admissible as direct proof thereof, rather than as "other act" evidence under Rule

18   404(b). <u>United States v. Ripinsky</u>, 109 F.3d 1436, 1441 (9th Cir.), <u>cert.</u> <u>denied</u>, 522 U.S. 1084

19   (1998), <u>quoting</u> <u>United States v. Soliman</u>, 813 F.2d 277, 278 (9th Cir. 1987); <u>United States v.</u>

20   <u>Santiago</u>, 46 F.3d 885, 889 (9th Cir.), <u>cert.</u> <u>denied</u>, 115 S.Ct. 2716 (1995); <u>United States v.</u>

21   <u>Williams</u>, 989 F.2d 1061, 1070 (9th Cir. 1993); <u>United States v. Sitton</u>, 968 F.2d 947, 958 (9th

22   Cir.), <u>cert.</u> <u>denied</u>, 113 S.Ct. 478 (1992); <u>United States v. Booth</u>, 926 F.2d 811, 815-16 (9th Cir.),

23   <u>cert.</u> <u>denied</u>, 500 U.S. 959 (1991).

24           In addition, evidence of other crimes, wrongs, or acts is not admissible to prove "the

25   character of a person in order to show that he acted in conformity therewith." Fed. R. Evid.

26   404(b). The defendant's history reporting earning of $10,000-20,000 per month is admissible

27   under Rule 404(b) when offered for any other relevant purpose, including "proof of [the

28   defendant's] opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or

1   accident." Id.  As the Ninth Circuit has emphasized, Rule 404(b) is a rule of inclusion – not a

2   rule of exclusion.  United States v. Pitts, 6 F.3d 1366, 1370-71 (9th Cir. 1991); United States v.

3   Ayers, 924 F.2d 1468, 1472-73 (9th Cir. 1991); United States v. Diggs, 649 F.2d 731, 737 (9th

4   Cir.), cert. denied, 454 U.S. 970 (1981); United States v. Sangrey, 586 F.2d 1312, 1314 (9th Cir.

5   1978) (Rule 404(b) is "one of inclusion"); United States v. Long, 574 F.2d 761, 766 (2d Cir.

6   1978) (Rule 404(b) is "intended to emphasize admissibility of 'other crime' evidence"); United

7   States v. Rocha, 553 F.2d 615, 616 (9th Cir. 1977); United States v. Papadakis, 510 F.2d 287,

8   294 (2d Cir. 1975) ("we are by now firmly wedded to the inclusory form of the rule, that

9   evidence of other crimes is admissible, if relevant, except when offered solely to prove criminal

10  character"); see also Huddleston v. United States, 485 U.S. 681, 688-89 (1988) (Congress

11  intended Rule 404(b) to avoid placing restrictions on the admissibility of similar acts evidence).

12  Cf. United States v. Mayans, 17 F.3d 1174, 1181 (9th Cir. 1994).  For this reason, the district

13  court is accorded "wide discretion in deciding whether to admit such evidence," and such

14  decision will not be reversed absent an abuse of that discretion.  Huddleston, 485 U.S. at 690;

15  Diggs, 649 F.2d at 73; United States v. Blitz, 151 F.3d 1002, 1007 (9th Cir. 1998).

16       Here, the government is not offering the loan applications as evidence of Swalim's

17  character.  While the defendant, through counsel, suggested that Swalim's consistent filing of

18  loan applications stating income of $10,000-20,000 per month *may* constitute Rule 404(b)

19  materials, the government disagrees.  To the contrary, the government maintains that Swalim

20  accurately reported his income on these applications, which is routinely admitted to establish

21  unreported income in tax cases.  United States v. Ahee, 5 Fed. Appx. 342, 355 (6th Cir. 2001.)

22       The Ninth Circuit has established the following four-part test to determine the

23  admissibility of other act evidence under Rule 404(b):

24       (1)   There must be proof of the other act based on sufficient evidence;

25       (2)   The other act must not be too remote in time;

26       (3)   If offered to prove intent, the other act must be similar to the offenses charged;

27       (4)   The evidence must be introduced to prove a material issue in the case.

28  United States v. Houser, 929 F.2d 1369, 1373 (9th Cir. 1991); see also United States v.

U.S.' Trial Brief
Case No. 07-298-CRB              -14-

1    Yamukian, 25 Fed. Apps. 522 at *1 (9th Cir. 2001); United States v. Murillo, 255 F.3d 1169,

2    1175 (9th Cir. 2001); United States v. Blitz, 151 F.3d 1002, 1007-08 (9th Cir. 1998); United

3    States v. Nelson, 137 F.3d 1094, 1107 (9th Cir. 1998).

4          The government contends that defendant's preparation of summary receipts, referred to

5    Z-Tapes, in 2004 which match his hidden books is intrinsic evidence, which does not fall with

6    the scope of 404(b).  The Z-Tapes printed in 2004 show the defendant's method of maintaining

7    his books.  He completes thousand of daily sales, prints a daily summary, and records that figure

8    in his books.  Indeed, Swalim recorded all the daily sales figures printed on the Z-Tapes in his

9    hidden books, which he now claims is false.  However, the Z-Tapes demonstrate that he would

10   have to complete tens of thousands of sales for his stated purpose of falsifying his books.  In that

11   regard, the 2004 Z-Tapes illustrate Swalim's manner of conducting business, and confirm his

12   concealed books are accurate.  Moreover, because this evidence is offered to establish his intent,

13   it is nevertheless admissible even it the Z-Tapes were characterized as extrinsic evidence.

14

15                                    Respectfully submitted,

16

17                                    JOSEPH P. RUSSONIELLO
                                       United States Attorney

18

19                                    /s/ Thomas M. Newman
                                       THOMAS M. NEWMAN

20                                     Assistant United States Attorney

21

22

23

24

25

26

27

28